UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ICPEP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:24-cv-01819-JRS-KMB |
| vs. | ) | |
| | ) | |
| SMC SPECIALTY FINANCE, LLC, | ) | |
| GARY S. RASKIN, and | ) | |
| ALASTAIR BURLINGHAM, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S BRIEF OPPOSING DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND ALTERNATIVE MOTION TO COMPEL ARBITRATION

### Preliminary Statement of Position

1. <u>Personal Jurisdiction</u>. Defendants present the Court with scarce applicable evidence to support their motion, and fail to show anything resembling the true picture of their extensive contacts, solicitations, business, benefits, profits, and communications with the state and citizens of Indiana supporting specific personal jurisdiction. Instead, they offer little more than bare conclusory declarations of Defendants Raskin and Burlingham that "they do no business in Indiana" and "never solicited Plaintiff." (ECF Nos. 8-1 at 2-3; 8-3 at 1-2). The evidence is contrary and substantially so.

2. <u>Arbitration</u>. The evidence demonstrates the absence of enforceable signed written agreements requiring arbitration on the two movie projects at issue: *The Present* and *Prosaic B*.

Moreover, the evidence demonstrates an absence of an enforceable written and signed agreement requiring arbitration of Plaintiff's abuse of process claim, a claim that stands apart from the two movie projects.

3.     <u>Requested Relief</u>. Accordingly, as detailed below, Plaintiff requests that this Court *deny* Defendants' motions and order them to file their responsive pleading to Plaintiff's complaint within 20 days' of denial.

4.     <u>Plaintiff's Submissions</u>. Plaintiff ICPEP, LLC ("ICPEP," pronounced "*Icy-Pep*") submits this brief pursuant to S.D. Ind. L.R. 7-1 in opposition to Defendants' motions and supporting brief (ECF No. 8 and 9). Plaintiff first filed its Appendix of Exhibits (ECF No. 14) supporting this brief, which includes the Declaration of Danny Chan (ECF 14-1), the sole owner and manager of ICPEP. Plaintiff filed, before but in conjunction with this brief, a separate motion for leave to take limited jurisdictional discovery (ECF No. 15) intended to target Defendants' additional Indiana contacts.

**Procedural History, Parties and ICPEP's Claims**

5.     <u>Procedural History</u>. On August 23, 2024, ICPEP filed its 5-count complaint (ECF No. 1-2) against Defendants seeking money damages in the Hamilton County, Indiana, Superior Court. On October 11, 2024, Defendants timely removed the case to this Court (ECF No. 1). On October 18, 2024, Defendants filed their Motion to Dismiss for Lack of Personal Jurisdiction, or in the Alternative, to Compel Arbitration (ECF No. 8), declarations and evidence in support (ECF No. 8-1, 8-2 and 8-3), and brief (ECF No. 9). Though couched as a motion to dismiss under Rule 12(b)(6), the initial motion is brought pursuant to Rule 12(b)(2). The Court granted Plaintiff's initial extension of time to respond until November 22, 2024 (ECF No. 11).

6.      Party: Plaintiff ICPEP. ICPEP is a Wyoming Limited Liability Company registered to do business as a Foreign Limited Liability Company in Indiana and does business from and in Hamilton County, Indiana at all material times. Part of ICPEP's business includes feature film production, lending, investing and participating in loans for film projects, producers, and production companies who use the loan proceeds to finance a portion of the production costs for feature motion pictures they produce. Danny Chan ("Chan") solely owns and manages ICPEP. (ECF No. 1-2 at 2-3; ECF No. 14-1 at 2).

7.      Party: Defendant SMC SPECIALTY FINANCE, LLC ("SMC"). SMC is a California Limited Liability Company formed in 2017. SMC is an acronym for "Sherborne Media Capital." SMC is an established media finance company. A significant portion of SMC's business consists of making loans to film and television projects, producers, and production companies who use the loan proceeds to finance a portion of the production costs for feature motion pictures and television shows they produce. SMC often obtains third-party capital to fund the loan advances by way of investment in SMC's loans. (ECF No. 1-2 at 3-4).

8.      SMC's Business: Since commencing lending activities in 2018, SMC has originated hundreds of millions of dollars of loans to media projects and producers. Defendants Gary Raskin ("Raskin") and Alastair Burlingham ("Burlingham") jointly own SMC. (ECF No. 1-2 at 3-4). SMC is a prolific movie production company and financier with 54 movie credits to its name since 2017. (ECF No. 1-2; ECF No. 14-3).

9.      SMC's Business Model Places all Risk of Movie Loan Non-Payment on its Investors. Based on ICPEP's experience with SMC, SMC rarely if ever lends its own money when making a movie loan. Instead, it solicits investors like ICPEP, usually multiple investors for one loan, to fund SMC's loans. SMC makes its money by charging loan fees to originate and

administrate the movie loans (and Raskin through attorney's fees to document the loans). Under this model SMC incurs little or no risk if the loans are not repaid. This leaves only its investors, like ICPEP, at risk if the borrower or guarantors fail to pay. SMC keeps its investors in the dark as to other investors and SMC's loan administration and collection efforts. Often, because SMC makes more money from fees it charges for loans to its best movie production companies, SMC has incentive at times to not collect loans, foreclose on collateral, or call loan guaranties. (ECF No. 1-2 at 74-75).

10.    <u>SMC's Incentive to Forbear from Loan Collection</u>.  SMC's movie production company borrowers are more likely to ask SMC for additional loans on future movies if SMC forbears from collection efforts on delinquent loans, resulting in additional and/or higher loan fees to SMC on the next loan. One such SMC client alleged in the Complaint is AGC. AGC is the purported loan Guarantor on SMC's loan to *The Present* movie's production company. (ECF No. 1-2 at 74-75, 83, 85-87 [¶ 11, 34, 42-46]).

11.    <u>Party: Defendant Gary Raskin</u>. Raskin is an individual adult residing in Los Angeles County, California, and an attorney licensed in the State of California since 1993, who, starting in April 2022, began dispensing legal advice to ICPEP and Chan in connection with various movie loan transactions, including for *The Present*. Raskin's law partner terminated the attorney/client relationship by letter dated May 27, 2024. (ECF No. 1-2 at 3-4 [¶ 4, 6]); (ECF No. 14-1 at 12 [¶ 22])). Raskin is a prolific movie producer, executive producer and movie attorney with a reported 76 movie credits to his name from 2005 through the present (71 since 2014). (ECF No. 14-4).

12.    <u>Party: Defendant Alastair Burlingham</u>. Burlingham is an individual adult formerly or currently residing in Los Angeles County, California, and a citizen of the United Kingdom

Burlingham is a prolific movie producer and executive producer with a reported 126 movie credits to his name from 2004 through the present (113 since 2014). (ECF No. 14-5).

13.     <u>Plaintiff's Claims - Count I: Account Stated</u>. On or about May 1, 2022, Defendants solicited ICPEP, through Chan by phone and email, to fund $500,000.00 of SMC's commercial loan of $2,000,000.00 to the movie's production company. (ECF No. 1-2 at 4-5 [¶ 7, 11]). Unlike the previous 13 six-seven figure investments made by ICPEP to SMC for various movie loans, no written funding agreement was finalized, signed or delivered prior to ICPEP's funding.  ICPEP funded the $500,000.00 based on the primary financial terms of the deal discussed through prior phone discussions and emails. (ECF No. 14-1 at 15-16 [¶ 27-29]). ICPEP seeks an award of $500,000.00 plus pre-judgment interest against SMC. (ECF No. 1-2 at 79-80).

14.     <u>Plaintiff's Claims - Count II: Indiana's Crime Victims Relief Act – *The Present*</u>. Plaintiff alleges fraud in the inducement of ICPEP's investment to SMC in its loan to *The Present* movie, fraudulent misrepresentations and omissions to convince ICPEP to forbear from collection through the course of SMC's loan to the movie borrower, failure to pursue collateral and guaranties, all to the financial benefit of Defendants, who acted with criminal intent to deprive ICPEP of its invested money. ICPEP seeks damages including up to treble damages, pre-judgment interest, and an attorney fee award against all Defendants. (ECF No. 1-2 at 80-89).

15.     <u>Plaintiff's Claims - Count III: Indiana Securities Act Fraud – *The Present*</u>. ICPEP alleges that Defendants fraudulently solicited and sold ICPEP a security without the required disclosures and through fraudulent misrepresentations and omissions. ICPEP seeks rescission of the transaction, return of its investment, pre-judgment interest and an attorney fee award against all Defendants. (ECF No. 1-2 at 89-91).

16.     Plaintiff's Claims - Count IV: Plaintiff's Claims: *Prosaic B Movie Project*. Count IV is a claim for Account Stated for non-payment of ICPEP's April 29, 2022 investment with SMC in the amount of $30,536.76. SMC never prepared or sent a written Funding Agreement for ICPEP's investment in SMC's movie loan fund. Raskin did, however, email a statement of account to Chan showing, as of December 31, 2023, that SMC owed ICPEP $30,536.76 plus interest. ICPEP seeks an award of $30,536.76 plus pre-judgment interest against SMC. (ECF No. 1-2 at 91-95).

17.     Plaintiff's Claims: Count VI – Abuse of Process. ICPEP and Chan suspected improper business practice or worse and began investigating Defendants. After investigating Chan communicated to Defendants in writing that law federal authorities "were coming." Chan never threatened to report Defendants unless they paid ICPEP. He simply said the authorities were coming[1]. Defendants reacted by filing a lawsuit in California. On June 14, 2024, SMC, Raskin and Burlingham sued Chan and others in the Superior Court of Los Angeles, California, Central District, alleging scandalous and frivolous civil claims against Chan for conspiracy to commit attempted extortion, intentional infliction of emotional distress, and unfair competition, Case No. 248T CV 14973 (the "California Lawsuit"). The California Court recently dismissed the extortion claim against Chan on demurrer. The other claims against Chan are at risk of dismissal unless the SMC Parties can serve process on the other individual Defendants living in Dubai, an unlikely event. Chan and not ICPEP is a defendant in the California case. Defendants here are the plaintiffs there. ICPEP seeks damages, reputational damages, attorney's fees expended to defend Chan in the California Lawsuit, and punitive damages from Defendants for

---

[1] In fact, Chan is in the process of reporting Defendants to state and federal authorities and recently responded to the Indiana Securities Commissioner's request for information and documentation on SMC's investment solicitations and ICPEP's investments with SMC. (ECF No. 14-1 at 19).

their alleged improper activities in the California lawsuit damaging to ICPEP.  (ECF No. 1-2 at 95-110)

**The Court's Evaluation of Personal Jurisdiction Facts**

18.    In light of Defendants' motion, Plaintiff acknowledges that it has the burden to demonstrate the existence of personal jurisdiction. In considering a Fed. R. Civ. P. 12(b)(2) motion, the Court should "take the plaintiff's asserted facts as true and resolve any factual disputes in its favor." *NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 620 (7th Cir. 2022), *cert. denied,* 143 S. Ct. 577, 214 L. Ed. 2d 341 (2023). The Court "may consider affidavits on the issue of personal jurisdiction; both parties' affidavits are accepted as true, and where they conflict, the plaintiff is entitled to resolution in its favor." *Id.* (citing *Curry v. Revolution Laboratories, LLC*, 949 F.3d 385, 393 (7th Cir. 2020)).

19.    Contrary to Defendants' argument (ECF No. 9 at 2, 5), "the plaintiff need not include facts alleging personal jurisdiction in the complaint." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423 (7th Cir. 2010). Plaintiff has filed the Declaration of ICPEP owner Danny Chan and documentary evidence supporting its position relating to Defendants' motions.

**Personal Jurisdiction Facts**

20.    From humble beginnings, Danny Chan, the son of immigrants, and a graduate of North Central High School and the IU Kelly School of Business, found international success in the business world and decided to come home to his Hoosier roots. Because he had a lifelong love of movies, he decided to try his hand at the movie business in an unconventional way: as a working stay-at-home husband and dad from his home in Fishers, Indiana. (ECF No. 14-1 at 2-4 [¶ 3-8]).

21.     Chan is a shareholder and CEO of Almost Never Films, Inc., a Nevada corporation ("ANF-Nevada"), formerly a publicly traded film production and financing company, which wholly owns a subsidiary company of the same name, Almost Never Films, Inc., an Indiana corporation ("ANF-Indiana"), which Chan formed in 2015 primarily as the operating company for ANF-Nevada. Chan is CEO of ANF-Indiana and has managed it since its formation through the present. It is through work on a movie project for ANF-Indiana that Chan met Raskin and Burlingham concerning their company SMC.  (ECF No. 14-1 at 4).

22.     In 2019, Chan, Burlingham and Raskin were introduced through one of Chan's business associates at ANF-Indiana, resulting in introductory phone calls, emails and a face-to-face meeting in Los Angeles, mutual interest moving forward, but no business deals. The parties discussed, and SMC pitched to ANF-Indiana and Chan, a bridge loan for an ANF-Indiana movie, *Breach*, starring Bruce Willis, but the parties made no deal. (ECF No. 14-1 at 4-5).

23.     The nature of SMC's business model, discussed above, necessarily requires Defendants to solicit investments to fund SMC's loans to its movie-making borrowers. (ECF No. 14-1 at 5).

24.     Beginning in 2020 and ramping way up in 2021, 2022 and 2023, Defendants embarked on a systematic campaign of repeatedly soliciting investments from Chan, his companies ICPEP and ANF-Indiana, and other wealthy people Chan knew. Burlingham and Raskin were aware from the beginning that Chan ran his movie and other business investment businesses from Indiana as a stay-at-home dad. Their primary form of communication was by phone and email. (ECF No. 14-1 at 6-12).

25.     As detailed in Chan's Declaration, Defendants solicited investments from Chan, ICPEP and ANF-Indiana – by reaching out to Chan in Indiana – well over 100 times concerning approximately 41 separate investment opportunities from 2020-2023. Of these 41 investment solicitations, ICPEP and Chan or his companies' ICPEP and ANF-Indiana, made 21 investments with SMC. (ECF No. 14-1 at 6-12; ECF 14-2).

26.     Between May 5, 2021 and April 8, 2024, all told, ICPEP, ANF-Indiana and Chan invested a total of $9,314,397.89 with SMC through 21 separate investments for 14 separate movies or movie projects, 18 of which were documented by written and signed Funding Agreements. Three of these (*The Present*, the third advance on *Prosaic B,* and *Red Right Hand*) were not. A spreadsheet prepared by Chan from ICPEP's and ANF-Indiana's business records accurately documents the 21 investments (ECF No. 14-2; ECF No. 14-1 at 8).

27.     ICPEP's first investment (on May 5, 2021) with SMC began a series of investments that, with the exception of the two loans at issue in the Complaint: *The Present* and the third advance on *Prosaic B* (discussed below), and a third loan not at issue here (*Red Right Hand*), all followed the same pattern: Defendants called and/or emailed Chan with an investment opportunity and solicited ICPEP's, ANF-Indiana's or Chan's personal investment; SMC's solicitation was followed by written materials Raskin or Burlingham sent to Chan via email; the parties then traded emails, calls and texts discussing the proposed investment; if it was agreeable, then Raskin sent Chan via email a written Funding Agreement in PDF format signed by Burlingham on behalf of SMC;  then Chan would sign it on behalf of ICPEP, ANF-Indiana or himself, returned the fully signed Funding Agreement to Raskin by email, then wired funds to SMC. (ECF No. 14-1 at 7-8).

28.    All of the actions Chan took on behalf of ICPEP or himself individually in his business dealings with Defendants, as described above, took place on ICPEP's and Chan's end in Indiana. (ECF No. 14-1 at 7).

29.    Between September 10, 2021 and April 23, 2024, ICPEP, ANF-Indiana or Chan received, in Indiana, 39 separate payments totaling $7,038,693.33 from SMC in repayment and returns on investments via wire transfer, in full or partial payment of some of the 21 investments, leaving $2,606,397.89 due and owing in principal, plus $2,606,397.89 in interest, for a total of $3,559,882.00, due and owing. (ECF No. 14-1 at 9 and 14-2).

30.    Chan has counted 1,009 emails to and from Defendants for the time period July 2019 through May 2024: 596 with Raskin and 413 with Burlingham. Some are duplicates where both were on the same email.  (ECF No. 14-1 at 12).

31.    From on or about April 2022 until May 27, 2024, Raskin advised ICPEP and Chan as an attorney through dozens of phone conversations and hundreds of email exchanges while Chan was physically in Indiana. (ECF No. 14-1 at 20-21).

32.    On June 17, 2022, Raskin and Burlingham, along with Chan and others, became shareholders and part owners of an Indiana corporation named Helix, Inc. Helix was formed to be a visual effects business (VFX) for digital filmmaking. Helix, Inc. is headquartered in Fishers, Hamilton County, Indiana. Since 2022 through the present, Raskin and Burlingham are part owners of an Indiana business that worked on a hit movie with Universal Pictures. (ECF No. 14-1 at 17; ECF 14-6).

33.    Because Defendants kept Chan and ICPEP in the dark as to SMC's other movie loan investors (ECF No. 14-1 at 7), targeted discovery would help determine if Defendants have solicited others in Indiana for investment.

34.    Defendants are prolific movie producers and executive producers, with a combined total of 256 movie credits to their names. Based on the 18 Funding Agreements Chan has reviewed, and the movie loan documents that Defendants filed here for the *Hail Mary* loan, it appears that Defendants, in addition to receiving typical returns on movie loans, also are contractually entitled to a percentage of the movie's profits from the movie-making borrowers. (ECF No. 14-1 at 13-14; ECF Nos. 14-3, 14-4 and 14-5).

35.    Chan has reviewed all of Defendants' reported movie credits. All of those movies have been, and now are, in return for payment, available to the people in Indiana to watch in Indiana theaters, through streaming services, through cable or satellite, for rent or purchase, or through subscription services such as Netflix, Prime and Hulu. Every time money is spent to watch those movies in Indiana and elsewhere, Defendants either are reaping profits or may in the future reap profits, including from the Hoosier State. It appears that Defendants benefit from their movies being put into the stream of commerce, including in Indiana. (ECF No. 14-1 at 14).

**Legal Standard Applicable to Defendants' Personal Jurisdiction Motion and Argument**

36.    Because this case is before the Court pursuant to 28 U.S.C. § 1332(a), the diversity jurisdiction statute, Indiana law applies to the personal jurisdiction analysis. Fed. R. Civ. P. 4(k)(1)(A); *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Indiana's long-arm statute authorizes personal jurisdiction to the full extent permitted by the Federal Due Process Clause, *LinkAmerica Corp. v. Albert*, 857 N.E.2d 961, 966–67 (Ind. 2006), so the only question is

whether the exercise of personal jurisdiction over Defendants "comports with the limits imposed by federal due process." *Curry v. Revolution Lab'ys, LLC,* 949 F.3d 385, 393 (7th Cir. 2020*)* (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).

37.    Plaintiff admits general jurisdiction does not apply. The only issue here is specific personal jurisdiction, which "lets a court decide only claims relating to a "defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

38.    The Seventh Circuit gives a three-part test for determining specific personal jurisdiction:

> First, the defendant's contacts with the forum state must show that it purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state. Second, the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities. And finally, any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice.

*NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 623 (7th Cir. 2022), *cert. denied,* 143 S. Ct. 577, 214 L. Ed. 2d 341 (2023).

39.    The Seventh Circuit has explained that "the contacts supporting specific jurisdiction can take many different forms." *uBID, Inc. v. GoDaddy Grp., Inc.,* 623 F.3d 421, 426 (7th Cir. 2010). An analysis of specific personal jurisdiction is fact-specific and determined on a case-by-case basis. *American Commercial Lines, LLC v. Northeast Maritime Institute, Inc.*, 588 F. Supp.2d 935, 942 (S. D. Ind. 2008).

A. <u>Defendants' Minimum Contacts and their Purposeful Availment of the Privilege of Conducting Business in Indiana</u>

40.     The first prong of the specific jurisdiction test looks to see if there are minimum contacts between defendants and the forum State. *Lexington Ins. Co. v. Hotai Ins. Co.*, 938 F.3d 874, 878–79 (7th Cir. 2019). This is a "broad standard" and "the contacts supporting specific jurisdiction can take many different forms." *uBID, Inc. v. GoDaddy Grp., Inc., 623 F.3d* at 426 (7th Cir. 2010).

41.     The Court can quickly put to rest Defendants' argument that they never "visited Indiana." (ECF No. 9 at 8). The Supreme Court has held that due process permits the exercise of personal jurisdiction over a defendant who "purposefully direct[s]" his activities at residents of a forum, even in the "absence of physical contacts" with the forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985). Moreover, the declarations of Raskin and Burlingham stating that neither they nor SMC have ever negotiated any agreements "in Indiana," and never conducted any business "in Indiana," only means that they never conducted these activities while physically "in Indiana." (ECF No. 8-1 at 2; 8-3 at 1-2).

42.     In 1985, before the electronic age, the Supreme Court noted that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* 471 U.S. at 476. Moreover, since 2022, Raskin and Burlingham are shareholders in a closely-held Indiana corporation which conducts movie-related business from Indiana (as co-shareholders with Chan), headquartered in Fishers, Indiana. (ECF No. 14-1 at 17; ECF No. 14-6).

43.     Burlingham's declaration that "we did not solicit Danny Chan or ICPEP, LLC" is conclusory, factually bare, and crumbles under the weight of Chan's Declaration specifically describing the 100 or so solicitations, most of which were made by Burlingham, for 41 separate

SMC investments, 21 of which ICPEP, ANF-Indiana or Chan funded, resulting from hundreds of emails and calls. (ECF No. 14-1 at 4-13; ECF No. 14-2). In deciding this motion the Court must resolve the factual disputes in favor of Plaintiff, *NBA Properties, Inc.* at 620*,* but even were that not the rule, Burlingham's averment, viewed in light of Chan's detailed Declaration, and logic, doesn't hold water and seems nothing more than toeing the company line.

44.     Though not precedential here, this Court's decision in *Estimating Grp. LLC v. Rickey Conradt, Inc.*, No. 119CV00586RLYDLP, 2020 WL 6287679, at *3–4 (S.D. Ind. Feb. 18, 2020), is similar to the facts here and instructive. The out-of-state company, RCI, "*continuously*" asked the Estimating Group, the Indiana company, to prepare estimates over a five year period, which the District Court found "much too long to be "random" or "attenuated." *Id.* (citing *Burger King*, 471 U.S. at 475). Here, Defendants repeated, numerous and continuous solicitations occurred over a four year period (2020-2023). Like RCI, Defendants' "communications with Plaintiff demonstrated a continued relationship, not a one-off-sales transaction." *Id.*

45.     Just as it was between RCI and the Estimating Group, each estimate (here each investment) was unique. It can be argued that each 6-7 figure investment Defendants solicited from ICPEP required at least as much, if not more, consideration than each "estimate" request by RCI of the Estimating Group. As with the estimates, each investment solicited by Defendants resulted in multiple phone calls, emails, and documents to evaluate before deciding whether ICPEP would invest. *Id.*

46.     Just as the Estimating Group did all of its work from Indiana, so did Chan on behalf of ICPEP and ANF-Indiana. *Id.* Defendants make the same argument that the Court in *Estimating Group* found unpersuasive, namely that "Chan could have resided in any other state

and it would have had no impact on the Defendants' business whatsoever." (ECF No. 9 at 11). The *Estimating Group* court rejected that argument, stating "the inquiry is not where the contract *could have* been performed; it is where the contract was *actually* performed. Since the Estimating Group completed all estimating work in Indiana, it is reasonable for Defendants to expect to litigate in Indiana. *Id*. (citing *Madison Consulting Group v. State of S.C.*, 752 F.3d 1193, 1204 (7th Cir. 2014). Similarly, ICPEP, ANF-Indiana and Chan conducted all of their activities related to Defendants' continuous investment solicitations, as well as actual investments made, in Indiana. (ECF No. 14-1 at 7-8).

47.    Highly applicable here, the Court in *Estimating Group* stated:

> [T]he parties never negotiated or signed a contract in person; they dealt with each other over the phone and through e-mail. In a case like this, where the contract was entered into and where it was negotiated is essentially a wash because the parties simply never met in person. Sure, RCI and Conradt may have *sent the communications* while physically present in other states, but those communications are still evidence that RCI and Conradt directed activity toward Indiana, notwithstanding that they might have originated outside of Indiana. *See Curry v. Revolution Lab'ys, LLC, 949 F.3d 385, 398 (7th Cir. 2020) (*"[P]urposeful direction" may be shown by evidence that the defendant's actions, even if initiated outside of the forum state, nevertheless were directed at the forum state.**")

The evidence here demonstrates that Defendants directed their solicitation and contractual activities at Indiana, as well as in defrauding Plaintiff in Indiana.

48.    *Madison Consulting Group* has similar facts to this case and involved the Defendant's solicitation of the Plaintiff's business, as is the case here. Moreover, one of the few factual arguments Defendants make is that Plaintiff initiated the first contact. (ECF No. 9 at 11). The Seventh Circuit found a similar argument unpersuasive: "Thus, our holding does not "attach controlling significance to one seemingly trivial fact, namely, which party made the initial telephone call to the other." *Id.* at 1203 (7th Cir. 1985). Here, especially given Defendants'

plethora of directed and targeted contacts towards Indiana, it matters not who made first contact

5 years ago. Under these circumstances, Defendants must have expected to be sued in Indiana.

49.    Defendants rely on *Prolific, LLC v. Freedom Cent. Holdings, Inc.*, No.

121CV02725SEBTAB, 2022 WL 2763234, at *2 (S.D. Ind. July 14, 2022), to claim specific

personal jurisdiction is lacking. (ECF No. 9 at 11). *Prolific* holds no precedent over this Court

and is distinguishable on the facts. In *Prolific*, the Court was concerned with a single contract

between the parties, and relied on the tried and true ruling from *Burger King Corp. v. Rudzewicz*,

471 U.S. 462, 478 (1985), that "an individual's contract with an out-of-state party ***alone***" is

insufficient to establish minimum contacts. (Emphasis in original). The slew of Defendants'

solicitations, the parties' contracts, interactions and volume of money that changed hands

through, to and from Indiana, hardly can be compared to "a single contract."

50.    Plaintiff has filed an accompanying motion for leave to take targeted personal

jurisdictional discovery. (ECF No. 15). If the Court finds Defendants' solicitation, not only of

ICPEP, but Chan, and his other company, ANF-Indiana, are not enough to establish Defendants'

targeting and purposeful availment of the privilege of doing business in the State of Indiana over

the last 4 years, then discovery of all Defendants' other investors solicited over the last 5 years is

a reasonable way to determine whether Defendants engaged in additional targeting of Indiana

and its citizens.

51.    Another way to establish minimum contacts is to use the "stream of commerce"

theory. "[T]he forum State does not exceed its powers under the Due Process Clause if it asserts

personal jurisdiction over a corporation that delivers its products into the stream of commerce

with the expectation that they will be purchased by consumers in the forum State." *Dehmlow v.*

*Austin Fireworks*, 963 F.2d 941, 946 (7th Cir. 1992) (quoting *World–Wide Volkswagen*, 444 U.S.

16

at 297–98.) The stream of commerce theory remains viable in the Seventh Circuit. *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 575–76 (7th Cir. 2020).

52.    Plaintiff has demonstrated that Defendants have profit interests, not unlike the movie owners, in those movies where they have garnered 256 movie credits. While unclear if the Court can take judicial notice of Defendants' IMDb credit reports (ECF No. 14-3, 14-4 and 14-5), jurisdictional discovery (request for admissions) should clear it up. Moreover, targeted jurisdictional discovery should allow Defendants to clarify which movies they have profit interests in (requests for production), and thereby determine whether they exploited the Indiana market for profit, which is an additional basis to find that Defendants should be expected to be haled into Court in Indiana. See, *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1027 (2021); see also, *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984).

B. Plaintiff's Injuries have Arisen out of Defendants' Forum-Related Activities.

53.    There can be little doubt, based on the evidence submitted, that Plaintiff's alleged claims, damages and injuries arose from Defendants' forum related activities. Counts I-IV of Plaintiff's directly concern two separate solicitations and ICPEP's investments (for *The Present* and the third advance on *Prosaic B*). Count V, Abuse of Process, concerns Defendants' demands made against ICPEP based on a California lawsuit against Chan to cause ICPEP to refund $65,000.00 in payments received from SMC, and discovery targeting ICPEP records and information located in Indiana.[2]

---

[2] After Defendants filed their brief in this case, the California court dismissed the "extortion" claim against Chan. Before that ruling, Defendants' stated "basis" for that lawsuit, attempted extortion, is no longer viable (ECF No. 8-2 at 33-54), placing the legitimacy of that lawsuit in question. Interestingly, Defendants' assert that ICPEP filed this lawsuit in "retaliation" against Defendants for filing the California lawsuit (ECF No. 9 at 1), yet ICPEP is not a party there, and Defendants have failed to raise a Rule 12(b)(6) motion for failure to state a claim here.

C. Exercising Specific Personal Jurisdiction over Defendants Comports with Traditional Notions of Fair Play and Substantial Justice.

54.    Defendants made no argument in their brief on this third prong of the analysis, so Defendants have waived that part of their argument: "We have repeatedly held that a party waives an argument by failing to make it before the district court." *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012).

55.    To the extent Defendants have not waived this argument, then in analyzing "fair play," the Court considers:

> The burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of [the underlying dispute], and the shared interest of the several States in furthering fundamental substantive social policies.

*Curry v. Revolution Laboratories, LLC,* 949 F.3d 385, 402 (7th Cir. 2020).

56.    These enumerated factors normally do not justify a determination against personal jurisdiction when a defendant's minimum contacts are significant. *Id*. at 760; quoting, *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 781 n. 10 (7th Cir. 2003). Plaintiff submits it has made such a significant showing. Where the plaintiff has "made a threshold showing of minimum contacts, that showing is generally defeated only where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* at 781 (7th Cir. 2003).

57.    Defendants have made no "compelling" showing. The only argument possibly up for consideration is Defendants' contention that Plaintiff has appeared, asserted counterclaims, and served discovery in a California Arbitration that Defendants filed, claiming that the

Arbitration concerns "the same transactions at issue in the Complaint in this lawsuit.". (ECF No. 9 at 1). This argument, presumably waiver, fails upon closer inspection.

58.    Plaintiff filed this lawsuit in Hamilton Superior Court on August 23, 2024. (ECF 1-2 at 1). Defendants filed their Arbitration against ICPEP in Los Angeles on September 3, 2024, *after P*laintiff filed this lawsuit.[3] When Defendants' filed their Demand for Arbitration, they were aware of Plaintiff's earlier filed lawsuit: "[O]n August 23, 2024, ICPEP initiated an action against SMC and its principals in the Hamilton Superior Court in Indiana, asserting claims for an accounting, fraud, and related claims arising out of or relating to the Funding Agreements." (ECF No. 14-7 [¶ 32]).

59.    Defendants' Demand for Arbitration, asserting claims concerning investments ICPEP made in certain SMC Loans, includes claims concerning the investments Plaintiff made in *The Present* and the third advance of *Prosaic B*, which are the subject of Plaintiff's Counts I-IV of the Complaint. Defendants knowingly raced to their local Arbitration provider, JAMS in Los Angeles, and filed the Arbitration before receiving a ruling from this Court.

60.    ICPEP answered Defendants' Demand for Arbitration, asserted counterclaims, and served discovery. These facts do not help Defendants, who omitted to mention ICPEP's affirmative defense number ten which alleges:

> 10.    Respondent disputes that there is a signed and binding arbitration agreement with respect to The Present loan (Exhibit D) or the third-funding agreement for Prosaic B, and therefore the arbitrator lacks jurisdiction to adjudicate the same.

---

[3] Defendants' exhibits purport to attach the Arbitration they filed against ICPEP (identified as Exhibit H in Defendants' Exhibits (ECF No. 8-3 at 131-206)); however, Exhibit H is a duplication of Exhibit G (ECF No. 8-3 at 55-130), the Arbitration Defendants filed against Sparkhouse. Plaintiff assumes this was a clerical error, so Plaintiff attaches the correct Arbitration that Defendants filed against ICPEP as Exhibit Q (ECF No. 14-7).

(ECF No. 8-3 at 210). Defendants also failed to mention that ICPEP's counterclaims asserted in the Arbitration, alleged:

> The Counter-Demand Funding Agreements does not include the funding agreement for "The Present," attached as Exhibit C to the Demand. This funding agreement is subject to a separate action pending in an Indiana court. Additionally, Exhibit D includes only the second funding agreement for Prosaic B, and does not include the third-funding agreement, which Respondent denies is signed and binding.

(ECF No. 8-3 at 211). If the Court exercises personal jurisdiction over Defendants in this case, and denies their motion to compel arbitration, then ICPEP will promptly seek dismissal of that part of Defendants' Arbitration concerning the subject matter of the claims in this lawsuit. Until then, because Defendants are seeking in the Arbitration a declaratory judgment that SMC owes ICPEP no money, breach of an oral agreement, and unjust enrichment, ICPEP must defend itself in the Arbitration, including taking discovery from Defendants in that proceeding.

61.     In any event, Plaintiff's legal positions asserted here and in the Arbitration are consistent, so accordingly, Plaintiff has not waived its rights to sue Defendants for the claims asserted in the Complaint and cannot be held responsible for Defendants' brash action in filing the California Arbitration when and how it did. In other words, any argument that Defendants may be asserting concerning the California Arbitration as a "compelling" reason that "would render jurisdiction unreasonable," is a red herring.

62.     Defendants make no argument that they will suffer undue burden by defending this lawsuit in Indiana. Rather, Defendants merely conclude and assert that they don't do business "in Indiana." A similar argument was made by the Defendant in *Linkepic Inc v. Vyasil, LLC*, 146 F. Supp. 3d 943, 954 (N.D. Ill. 2015), where the District Court found that because the defendant had sufficient contacts with the forum state, including alleged tortious activity, that

"he should have expected, no less anticipated, defending that conduct herein and thus, cannot be heard to complain of the burden [he] allegedly invited." *Id*. And so it is with Defendants here.

63.    As alleged in the Complaint, Defendants unsuccessfully defended a lawsuit in London, England, seemingly a far greater financial burden for California residents than defending a lawsuit in Indiana. (ECF No. 1-2 at 29 [¶ 82 D.]).

64.    The ongoing nature of Defendants' voluntary assumption of an interstate relationship with ICPEP favors the exercise of personal jurisdiction: "In our view, the ongoing nature of the interstate business relationship is key to the minimum contacts analysis. As [*Citadel Group Ltd. v. Washington Regional Medical Center*, 536 F.3d 757 (7th Cir. 2008)] emphasized, the boundary of personal jurisdiction is crossed when the defendant 'should have reasonably anticipated being haled into court' in the forum, because 'the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed.' *American Commercial Lines, LLC v. Northeast Maritime Institute, Inc.*, 588 F. Supp.2d 935, 943-4 (S. D. Ind. 2008) (quoting *Burger King,* 471 U.S. at 474).

65.    Indiana has a strong interest in providing a forum for adjudicating a suit where one of its citizens seeks redress for harms suffered within the state by out-of-state actors. See, *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 402-403 (7th Cir. 2020). Indiana has enacted a statute to protect its citizens from fraud (Count II), securities fraud (Count III), and regulates, through the Indiana Securities Division of the Secretary of State, securities matters. In fact, at the request of the Indiana Securities Commissioner, Marie Casteter, Chan has submitted information and documents for her Division to review concerning Defendants, whom ICPEP alleges engaged in securities fraud (ECF No. 14-1 at 19). For all of the above reasons, personal jurisdiction here is fair.

### Arbitration law, Facts and Argument

66.    It should first be noted that the relief Defendants asks from this Court, to compel the parties to arbitration before JAMS in Los Angeles, California, concerning Plaintiff's alleged claims in this action, is relief that this Court lacks the authority to grant:

> In accordance with the construction of § 4 [9 U.S.C. § 4] as a restriction on the authority of nonforum courts, this Circuit has concluded that where the arbitration agreement contains a forum selection clause, only the district court *in that forum* can issue a § 4 order compelling arbitration. Otherwise, the clause of § 4 mandating that the arbitration and the order to compel issue from the same district would be meaningless.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 327 (7th Cir. 1995).

Defendants request no alternative relief.

67.    Assuming the Court will rule in some form or fashion on Defendants' entitlement to arbitrate, Plaintiff addresses the substance of Defendants' arbitration motion. Plaintiff agrees with Defendants that Defendants bear the burden of demonstrating a valid agreement to arbitrate. *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). The crux of the issue before the Court is whether enforceable arbitration agreements exist for the claims Plaintiff asserts in the complaint.

68.    Plaintiff agrees with Defendants that this Court applies the substantive law of Indiana. To determine whether the parties entered into an enforceable arbitration contract, "a federal court should look to the state law that ordinarily governs the formation of contracts." *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 367 (7th Cir.1999).

69.    A party seeking to compel arbitration must first establish that an arbitration agreement exists. *Gen. Ass'n of Regular Baptist Churches v. Scott*, 549 F. App'x. 531, 533 (7th

Cir. 2013). "It is the court and not the arbitrator that must decide whether a contract exists before it decides whether to stay an action and order arbitration. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 741 (7th Cir. 2010). To compel arbitration, the agreement to arbitrate must be in writing. *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 690 (7th Cir. 2005).

70.     Plaintiff begins the analysis with the simplest decision, namely Counts IV and V of the Complaint. Plaintiff starts with Count IV. Plainly stated, no arbitration agreement exists that might apply to Count IV (Account Stated: third advance on *Prosaic B*). As explained by Chan (ECF No. 14-1 at 8) and as illustrated in his spreadsheet (ECF No. 14-2), showing all advances and payments for the 21 investments, each advance was a separate transaction. For 18 of the 21 investments, a written Funding Agreement was signed and delivered. As shown in the spreadsheet, ICPEP made 3 separate investments with SMC on *Prosaic B*: 12/17/21 ($85,000.00); 4/21/22 ($120,089.13); and 4/29/22 ($30,536.76).

71.     Plaintiff believes that a signed Funding Agreement exists for the first two *Prosaic B* investments, but none exists for the third. If one existed, then Defendants would have attached it to their motion. Instead they attached Exhibit E, a document titled: Funding Agreement – Second. (ECF No. 8-2 at 28-32). It governs ICPEP' $120,089.13 investment only, which matches the second investment amount that ICPEP made on *Prosaic B*, but not the third.

72.     The Funding Agreement for the second investment under *Prosaic B* does not purport to provide for "additional advances" for the *Prosaic B* loan facility, and only governs the $120,089.13 investment. Exhibit E does not concern nor govern the third advance, so any arbitration agreement contained in the Funding Agreement – Second, only requires arbitration of claims related to the second advance of $120,089.13. Hence, no written arbitration agreement exists for ICPEP's third investment ($30, 536.76) to SMC for *Prosaic B*. Unless this was a

mistake, one is left to question the veracity of Raskin's declaration at Paragraph 10 to the contrary. (ECF No. 8-1 at 3). Hence, no sustainable grounds exist to grant Defendants' motion to compel Count IV to arbitration, and Plaintiff urges the Court to deny it.

73. Count V is ICPEP's claim for Abuse of Process, (ECF 1-2 at 26-41), and is also a straightforward decision. Defendants mischaracterize the claim as one concerning signed Funding Agreements between ICPEP and SMC on various investments requiring arbitration. (ECF No. 9 at 17). It is not, rather, ICPEP alleges that Defendants have and continue to abuse the process of the California court in ways damaging to ICPEP. (ECF No. 1-2 at 33-41). ICPEP's investigation of Defendants' improper and possibly illegal conduct in the administration of Funding Agreement investments serves as the backdrop to Defendants' abuses of process (ECF No. 1-2 at 26-32), but not to the claim  itself. In the Abuse of Process claim, ICPEP seeks tort damages from Defendants for their alleged improper activities in the California lawsuit damaging to ICPEP. No arbitration agreement governs Defendants' abuses of process through their California lawsuit. Hence, no sustainable grounds exist to grant Defendants' motion to compel Count V to arbitration, and Plaintiff urges the Court to deny it.

74. Counts I – III (Account Stated, Indiana Crime Victim's Relief Act fraud claims, and violation of the Indiana Securities Act (fraud)) all concern Plaintiff's $500,000.00 investment with SMC concerning *The Present*. Decision on this claim only concerns the existence of a written arbitration agreement consented to by the parties.

75. To begin, Chan on behalf of ICPEP, never understood or believed there to be a written Funding Agreement for ICPEP's investment with SMC for The Present. (ECF No. 14-1 at 16-17). Chan explained in his Declaration how the typical process occurred resulting in an ICPEP investment documented by a written Funding Agreement with SMC:

24

Alastair or Gary called and/or emailed me with an investment opportunity and solicited ICPEP's or my personal investment; SMC's solicitation was followed by written materials Gary or Alastair sent to me via email; we then traded emails, calls and texts discussing the proposed investment; if I was agreeable to their proposal, then Gary sent me via email a written Funding Agreement in PDF format signed by Alastair on behalf of SMC;  then I would sign it on behalf of ICPEP (or on one occasion, I signed it individually), returned the fully signed Funding Agreement to Gary by email, then wired funds to SMC.

(ECF No. 14-1 at 7-7).

76.    *The Present* investment was in some ways similar, but different in several material respects:

On April 29, 2022, Alastair first solicited an investment. Unlike the previous investments ICPEP and I made with SMC, Alastair and Gary told me that this loan was not a bridge loan, but rather a longer term "senior" loan. Gary and Alastair told me that AGC had invested equity into the film and that the $2,000,000.00 would be a senior loan that got paid back first when the film sold. Unlike the previous ICPEP investments, Gary did not email me a PDF version of the Funding Agreement with an SMC signature. Instead, Gary emailed me, on June 16, 2022, what he described in his email as a "draft" Funding Agreement in WORD format without a signature. I had carefully gone over the loan details with Gary and Alastair over the phone and by email, and the terms of ICPEP's investment in SMC's senior loan, as alleged in paragraphs 12-14 of ICPEP's complaint. (ECF No. 1-2 at 75-76). As indicated above, I trusted Gary's words that the loan was senior, secured by adequate collateral, and guaranteed by AGC. Before looking at the draft Funding Agreement I directed ICPEP's wire from Indiana for $500,000.00 to SMC on June 16, 2022. Gary never asked me to send a signed Funding Agreement to him before wiring funds, or anytime over the following 14 months, which was not in line with our normal business practice, but this was a different kind of a deal than I had done with SMC in the past, I trusted Gary and Alastair, so I went with it.

(ECF No. 14-1 at 15-16).

77.    Chan further described the September 29, 2023 email, the meaning of which Chan explains, which is at odds with Defendants' over-baked speculation:

After learning that SMC did not have a senior loan, that the movie borrower sold the movie without payment to ICPEP, and having received various questionable excuses why payment was not received, I emailed Gary on September 29, 2023. I knew I never signed a Funding Agreement for *The Present* and never received a signed Funding Agreement from SMC. I was concerned that Gary and Alistair were

not being truthful with me. So, I asked Gary in my email to send a copy of the fully signed Funding Agreement. I worded it as I did because it was a test to see how Gary would respond. He replied with an email attaching a PDF Funding Agreement with Alastair's signature on behalf of SMC. He did not say when it was signed.

(ECF No. 14-1 at 16-17).

78.    Only Chan knows what his intent was in sending his email, and that doesn't change simply because Defendants characterize the email as an admission from Chan that he knew a fully signed Funding Agreement for *The Present* existed or that he must have signed it. (ECF 9 at 14). This same argument failed in *Gen. Ass'n of Regular Baptist Churches v. Scott*, 549 F. App'x 531, 534 (7th Cir. 2013).

79.    Chan has sworn he never signed it, didn't think he ever had the final version of it, and Defendants have no evidence that he signed it. By this time Chan went from fully trusting Defendants when they negotiated *The Present* investment to becoming very suspicious of them when he sent the 9/29/23 email, as alleged throughout the Complaint. Oddly, neither Raskin nor Burlingham stated in their respective Declarations *when* Burlingham signed the Funding Agreement. Defendants admitted through their brief, however, that the Funding Agreement was signed *after* receipt of Chan's September 29, 2023 email, sent more than 14 months after ICPEP invested $500,000.00 with SMC: "Upon receiving this request, Raskin had the Present Funding Agreement signed by SMC and emailed that to Chan." (ECF No. 9 at 14).

80.    It's simply too convenient and outside normal business practice, especially by an experienced attorney such as Raskin, acting as attorney for both sides of the transaction, to conveniently turn the "draft" he sent Chan on 6/16/22 into a PDF 14 months later when the parties are more at odds, then have his SMC partner Burlingham sign it, then argue that his

earlier draft had to be the agreement the parties made and an email Chan sent 14 months later proves that Chan signed it. Defendants' argument is far-fetched and unpersuasive.

81.    Plaintiff acknowledges that Indiana case law sometimes holds that when only one party signs an arbitration contract that the non-signing party can hold the signing party to the contract. That's not what we have here, in fact no one signed an arbitration agreement for *The Present* before, contemporaneously with, or any time shortly after the investment. SMC signed it 14 months after-the-fact. However, under Indiana law, where a court is asked to compel or stay arbitration, it faces the threshold question of whether the parties have agreed to arbitrate the particular dispute. *Williams v. Orentlicher*, 939 N.E.2d 663, 668 (Ind. Ct. App. 2010).

82.    In Indiana, the party seeking to compel arbitration has the burden of demonstrating the existence of an enforceable arbitration agreement. *Wilson Fertilizer & Grain v. ADM Milling Co.,* 654 N.E.2d 848, 849 (Ind.Ct.App.1995), *trans. denied.* Whether the parties have agreed to arbitrate a dispute or not, Indiana applies ordinary contract principles. *Sanford v. Castleton Health Care Ctr., LLC*, 813 N.E.2d 411, 416 (Ind. Ct. App. 2004).

83.    ICPEP verbally agreed to invest $500,000.00 in a senior loan with an AGC guaranty, repayment upon sale of the movie, plus 1.25% interest/month, but these were the only terms specifically discussed before ICPEP wired the money. (ECF No. 14-1 at 15). Indiana requires the following to form a contract:

> The existence of a contract is established by evidence of an offer, acceptance, consideration, and a manifestation of mutual assent. *Ind. Dep't. of Corr. v. Swanson Servs. Corp.,* 820 N.E.2d 733, 737 (Ind.Ct.App.2005), *trans. denied.* "To bring a contract into existence, an offer must be extended and the offeree must accept it, the communication of acceptance being crucial. Thus, a meeting of the minds between the contracting parties is essential to the formation of a contract." *Id.* This meeting of the minds must extend to all essential elements or terms for a contract to be binding. *Id.* Likewise, "[f]or an oral contract to exist, parties have to agree to

all terms of the contract." *Kelly,* 825 N.E.2d at 857. "If a party cannot demonstrate agreement on one essential term of the contract, then there is no mutual assent and no contract is formed." *Id.*

*Troutwine Ests. Dev. Co., LLC v. Comsub Design & Eng'g, Inc.*, 854 N.E.2d 890, 897

(Ind. Ct. App. 2006). Here, the only agreement the parties reached was verbal, and it did

not include arbitration.

84.     The "draft" Funding Agreement Raskin sent Chan on 6/16/22 did not provide for

a senior loan or AGC's loan guaranty, but did provide for other matters the parties did not

discuss, including arbitration. Raskin's draft did not match the parties' verbal arrangement. It did

not provide for AGC's guaranty. That it was the same or similar in its "form" to previous

Funding Agreements between the parties does not matter, especially given SMC's loan to *The*

*Present* Borrower was not a bridge loan – as all the previous loans ICPEP invested in had been –

it was supposed to be a longer term "senior" loan.

85.     Defendants' reliance on *Nationwide Ins. Co. v. Heck,* 873 N.E.2d 190, 196 (Ind.

Ct. App. 2007), is misplaced for the proposition cited, but instructive as to the enforceability of

the parties' verbal agreement.  While that Court found that the validity of a contract is not

necessarily dependent upon the signature of the parties, the facts there were nothing like here.

There was no "draft" agreement that neither party signed and one party tried to enforce against

the other, as here. Rather, that case concerned a verbal agreement and its enforceability.

86.     Neither does *Indiana Bureau of Motor Vehicles v. Ash, Inc.*, 895

N.E.2d 359, 366 (Ind. Ct. App. 2008) advance Defendants' position. Unlike here, the parties in

*Ash* exchanged faxed written terms of an agreement and the receiving party signed the fax. "In

the bottom left hand corner of the faxed document was a Post–It Fax Note. The note indicated

that the fax was sent to 'Butch' from 'Marsha.' In the bottom right hand corner of the document,

Corne wrote, 'I accept the above conditions.' Corne signed his name below that and faxed the document back to White on January 15, 2003." *Id*. at 363 (Ind. Ct. App. 2008). The non-signing party was able to enforce the terms found in the fax against the signing party. Accordingly, had ICPEP signed the Draft Funding Agreement sent by Raskin, it would be a different story, but that is not the case and *Ash* is inapposite.

87.    In looking at the draft Funding Agreement, Exhibit B (ECF No. 8-3 at 13), SMC failed to comply with its payment provision, which reads:

> 2.    <u>Funding Amount</u>: Funder shall fund to Company the sum of Five Hundred Thousand Dollars ($500,000) to be wired to Company *promptly upon execution* of this Agreement (the "Funding Amount"). *All amounts received by Company prior to delivery* by the Company to or directly for the benefit of the Borrower pursuant to the Loan Facility *shall be held in trust by Company for the benefit of Funder* and shall not be used for any purpose other than in accordance with the terms of this Agreement.

(Emphasis added) ("Company" is SMC and "Funder" is ICPEP).

88.    Defendants have nowhere claimed that the Funding Agreement was signed and delivered before SMC used ICPEP's funds, or that SMC held any of that money in trust. The very agreement that Defendants ask the Court to determine to be the parties' agreement, itself required signatures and delivery, pending which SMC was to hold ICPEO's money in trust. This did not happen.

89.    Defendants should not be entitled to claim estoppel to enforce the unsigned and undelivered Funding Agreement against ICPEP, especially since ICPEP has received no benefits under the transaction (it is out $500,000.00) and SMC apparently loaned ICPEP's money, and if it hasn't been repaid, then SMC has lost nothing.  This is not a situation where a non-signatory to exploits or directly receives a "benefit" from the agreement containing the arbitration clause.

90.     For all of the foregoing reasons, Plaintiff urges the Court to deny Defendants' motion to compel arbitration.

Date: November 22, 2024

Respectfully submitted,
BLEECKER BRODEY & ANDREWS

/s/ David J. Tipton
David J. Tipton, Attorney #2125-98
Email: dtipton@bbanda.com
9247 N. Meridian Street, Suite 101
Indianapolis, IN 46260
Phone: (888) 574-0700
Facsimile: (888) 574-0770
*Attorneys for Plaintiff, ICPEP, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 22, 2024, a copy of the foregoing has been filed electronically through the Court's ECF system. Notice of this filing was sent to the following persons by operation of the Court's Electronic filing system:

Andrew F. Marquis
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
10 West Market Street
Suite 1400
Indianapolis, IN 46204
(317) 637-1777
Fax: (317) 687-2414
Email: amarquis@scopelitis.com
Attorneys for Defendants